**PAPAGO TRIBAL UTILITY AUTHORITY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

and

**Arizona Public Service Company, Intervenor.**

No. 84–7563.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1985.

Decided Nov. 13, 1985.

Arnold D. Berkeley, Richard I. Chaifetz, Washington, D.C., for petitioner.

William H. Satterfield, Gen. Counsel, Barbara J. Weller, Deputy Sol., A. Karen Hill, Atty., F.E.R.C., Washington, D.C., for respondent.

Thomas E. Parrish, Vicki G. Sandler, Arizona Public Service Co., Steven M. Wheeler, Snell & Wilmer, Phoenix, Ariz., Richard M. Merriman, Brian J. McManus, Reid & Priest, Washington, D.C., for intervenor Arizona Public Service Co.

Before CANBY and NORRIS, Circuit Judges and SMITH *, District Judge.

CANBY, Circuit Judge:

Under the Federal Power Act, 16 U.S.C. § 824 et seq., the Federal Energy Regulatory Commission regulates wholesale sales of electric power. Appeals from FERC decisions are within our jurisdiction pursuant to section 313(b) of the Act, 16 U.S.C. § 825$l$ (b). Here appellant Papago Tribal Utility Authority (PTUA) challenges a FERC decision in FERC Docket No. ER82–481 establishing wholesale electric power rates for appellee Arizona Public Service Company (APS), an Arizona public utility from which PTUA buys electricity for resale. PTUA attacks APS' proposed rate treatment of investment tax credits attributable to property placed in service before 1980. It also claims that APS has not acted "prudently" in proceeding with construction of the Palo Verde nuclear power plant, to the detriment of its customers. We affirm the FERC decision.

PRIOR PROCEEDINGS

This proceeding began when APS filed with FERC a request for increases in its wholesale electric rates. The Federal Power Act requires that proposed rate changes be "just and reasonable," and gives FERC the power to fix just and reasonable rates if the proposed rates do not meet that test. 16 U.S.C. §§ 824d, 824e. FERC requested a public hearing on APS' proposed rate

---

* The Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

increases. A number of APS wholesale customers then intervened, including appellant PTUA. All of the issues that the intervenors raised were settled or mooted except two raised by PTUA.[1] The issues, as framed by a stipulation of the parties, were:

1) What is the proper rate treatment in this proceeding for investment tax credits associated with property placed in service prior to 1981 and utilized in the Period II cost of service in this docket?[2]

2) Should APS' rates in this proceeding be adjusted if the Commission determines in this docket that Palo Verde Nuclear Generating Station Units 1 or 2 or 3 will not be used or useful when placed in service?

A hearing on these two issues was held before an administrative law judge. On November 2, 1983, the ALJ decided in favor of APS on both issues. PTUA appealed these adverse decisions to the Commission. The Commission affirmed on both issues, with little discussion. The Commission did say that PTUA had not proved its case on the Palo Verde issue. PTUA filed a timely petition for rehearing, which was denied. It then timely filed the instant petition seeking review of the FERC order.

## STANDARD OF REVIEW

■ In reviewing a Commission order, the court has three responsibilities.

First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of

the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests.... The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

*Permian Basin Area Rate Cases*, 390 U.S. 747, 791, 792, 88 S.Ct. 1344, 1372, 1373, 20 L.Ed.2d 312 (1968). Restricted judicial review is particularly appropriate where, as here, the FERC order addresses complex and technical problems of utility regulation that fall within the special expertise of the Commission. *Nevada Power Co. v. Federal Power Comm.*, 589 F.2d 1002, 1006 (9th Cir.1979).

## THE INVESTMENT TAX CREDIT ISSUE

■ Section 46(f)(3) of the Internal Revenue Code, 26 U.S.C. § 46(f)(3), permits public utilities to give their ratepayers the immediate benefit of investment tax credits associated with certain utility property placed in service prior to 1981. Under this "immediate flow-through" treatment of investment tax credits, the reduction in tax liability that results from the use of a credit is passed on in full to the ratepayers in the year in which the credit is actually used to decrease the utility's taxes. Immediate flow-through is an alternative to "normalized" treatment, or "ratable flow-through".[3] Under "ratable flow-through,"

1. Another intervenor, Arizona Electric Power Cooperative, Inc., joined in the administrative proceeding on one issue. AEPCO has not appealed the administrative decision.

2. "Period II cost of service" is an estimate of the cost to the utility of providing service over a 12 month period. In the ratemaking process, this estimate is compared with the actual cost of

service over the most recent 12 month period for which data are available.

3. Although we use it as a convenient shorthand, "normalization" is not really the proper term to describe the rate treatment of investment tax credits. "Normalization" technically describes the accounting treatment of differences between the time at which the utility pays tax and the time at which the utility collects tax costs from

the ratepayers do not receive the benefit of investment tax credits immediately. Instead, the tax savings resulting from credits are incorporated into the utility's cost of service (and accordingly decrease the utility's rates) *pro rata* over the useful life of the asset associated with the credit. Such treatment is favorable for the utility because it permits the utility to use the money (or its time value, depending on the rate treatment that the company chooses) for capital investment purposes during the interim between the reduction in tax liability and the compensating rate reductions.

In previous FERC proceedings, APS has chosen immediate flow-through treatment of tax credits associated with eligible property. In the instant proceeding, however, APS sought to "normalize" the effect of certain investment tax credits in computing its wholesale power rates. According to PTUA, such "normalized" treatment will increase APS' wholesale rates by nearly $6 million. The administrative law judge nevertheless decided that APS should be permitted to flow through the benefits of investment tax credits ratably to its customers.

On appeal from the FERC decision affirming the ALJ, PTUA argues that the Federal Power Act prevents FERC from authorizing APS to use any means of accounting for investment tax credits other than immediate flow-through.[4] According to PTUA, both judicial interpretations of the Federal Power Act and the Commission's precedents hold that "tax savings" realized by a utility must be passed on immediately to the utility's ratepayers. The underlying principle identified by PTUA is that utility rates should reflect only costs that the utility has actually incurred in providing service. Since "normalization" initially permits the utility to reduce its cost of service for purposes of

calculating its rates by an amount less than the actual reduction in taxes during the ratemaking period, PTUA implies that such treatment allows the utility to charge a rate that is more than "just and reasonable."

The first flaw in PTUA's argument is that the Commission has not embraced the principle that "tax savings" must be passed through immediately to ratepayers in all cases. The FERC cases cited by PTUA are inconclusive. For example, in a prior APS rate case, *Arizona Public Service Company*, 1 FERC ¶ 63,045, *aff'd* 4 FERC ¶ 61,101 (1978), the issue was whether APS should be permitted to include in its cost of service $9 million in tax liability which had been eliminated by investment tax credits, even though at that time the utility had no plans to restore the $9 million to its customers in "normalized" fashion or in any other fashion. In *Delmarva Power and Light Company*, 24 Federal Power Service 5–646, 654–55 (August 1, 1983), the issue before the Commission was whether the company could include the tax credits in its cost of service calculation ratably and *also* add them to its rate base. Even though FERC held in both cases that the utility could not add the unpaid taxes to its cost of service, neither case settled the question whether a utility can switch its rate treatment of investment tax credits from immediate flow-through to ratable flow-through.

Absent a clear FERC precedent, the question before us is whether the agency made a reasonable policy choice when it decided to allow APS to "normalize" the effect of investment tax credits on its wholesale rates. PTUA's argument seems to assume that any rate that does not give ratepayers the immediate benefit of any cost savings realized by the utility is inherently "unjust and unreasonable." That is not a valid assumption. The ALJ, citing

ratepayers. Here the question is not how the burden of a deferred tax will be shared among ratepayers, but rather how the ratepayers will share the benefit of tax credits which reduce the utility's total tax liability.

4. PTUA appears to have argued before the ALJ that the tax code itself prohibits APS from abandoning immediate flow-through. That is clearly

an untenable position. § 46(f)(3) *permits* a utility to continue using immediate flow-through on qualifying pre-1981 property without jeopardizing its investment tax credit, but it does not *require* such treatment either for utility ratemaking purposes or as a prerequisite to continued eligibility for the tax credit. *See* Rev.Rul. 78–193, 1978–1 C.B. 12.

the testimony of APS witness Paul Williams, found that "normalized" treatment of the cost savings that result from investment tax credits serves the public interest. According to Williams, "normalization" accomodates the utility's need for investment capital by permitting the utility to generate more capital internally. Williams further testified that "normalization" spreads the benefit of the credits among all those who are served by the asset that generated the credits, instead of conferring it only on those who happen to be ratepayers when the credits are utilized. Moreover, the Arizona Corporation Commission, which has regulatory authority over retail sales of electricity in Arizona, requires APS to normalize the effect of investment tax credits in setting rates for the 90% of APS customers within its jurisdiction. In light of all this evidence, it appears that the FERC administrative decision considers both the utility interests and the public interests at stake, as *Permian Basin* requires, and sensibly accomodates them.

The Congressional policy favoring ratable flow-through of investment tax credits reinforces our conclusion. This policy distinguishes investment tax credits from other kinds of cost savings that utilities may realize from various sources. Congress intended that the savings arising from investment tax credits on utility property would be used at least partly for the benefit of the utility and its shareholders. The House Report to the Revenue Act of 1971, which added § 46(f) to the Tax Code, makes this clear. "Although there are many different ways of treating the (investment tax) credit for rate making purposes, your committee, in general, believes that it is appropriate to divide the benefits of the credit between the customers of the regulated industries and the investors in the regulated industries." H.R.Rep. No. 533, 92d Cong., 1st Sess. 24, *reprinted in* U.S.Code Cong. and Admin.News 1971, 1825, 1839 (1971). Moreover, although Congress chose to permit immediate flow-through of tax credits (thus giving the entire benefit to ratepayers) in "a limited number of cases" where the utility already employed that method, it made clear that this was an exception to the general rule. *See* S.Rep. No. 437, 92d Cong., 1st Sess. 36, *reprinted in* U.S.Code Cong. and Admin. News 1971, at 1943.

Since the enactment of § 46(f), Congress has further limited the availability of investment tax credits for utilities that choose to flow them through immediately to ratepayers. The Tax Reduction Act of 1975 permitted immediate flow-through treatment for the additional tax credits enacted in that bill only by those utilities which previously had elected immediate flow-through. § 301(b)(3), 26 U.S.C. § 46(f)(8). The Economic Recovery Tax Act of 1981 completely eliminated the immediate flow-through option for utility property placed in service after 1981. § 201, 26 U.S.C. § 168(e)(1). Thus APS' use of immediate flow-through for its pre-1981 tax credits has been permitted under a vestige of § 46(f) that in time will disappear entirely. FERC has not exceeded its statutory authority by allowing APS to abandon this ratemaking procedure in favor of "normalization."

The changes in the tax laws governing ratemaking treatment of investment tax credits have undermined *El Paso Natural Gas Company v. FPC*, 281 F.2d 567 (5th Cir.1960), *cert. denied* 366 U.S. 912, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961), on which PTUA relies. There the Fifth Circuit held that El Paso Natural Gas could include in its cost of service only taxes that it actually paid, not taxes which it did not have to pay as a result of the gas depletion allowance. The rationale of this decision, however, was that tax savings, like other cost of service savings, should be passed on to consumers. *See id.* at 573. Congress has subsequently made clear that investment tax credits are intended not only for the benefit of consumers but also for the benefit of the regulated utilities. Nothing in *El Paso* requires FERC to disregard Congress' clearly expressed intent by allocating the entire benefit of tax credits associated with pre-1981 property to the ratepayers.

## THE NUCLEAR POWER PLANT ISSUE

The Palo Verde Nuclear Generating Station consists of three nuclear generating

units in various stages of construction near Phoenix. As presented to the administrative law judge by stipulation of the parties, the issue with respect to Palo Verde was whether APS' wholesale rates should be adjusted on the ground that the plant would not be "used and useful" when placed in service. During the arguments before the administrative law judge, however, PTUA apparently sought an order requiring APS either to sell part of the plant's capacity or to sell the plant itself. On appeal, PTUA specifically states that it wants "a Commission decision that APS should cease construction of Palo Verde Unit 3 and should sell it outright or temporarily."

The purpose of the present proceeding is to determine the lawfulness of APS' proposed wholesale rates for electricity. The issue is whether those rates are "just and reasonable" within the meaning of 16 U.S.C. § 824d. PTUA presents no authority for the proposition that an order directing APS to sell a generating plant is within FERC's power to set rates or our power to review FERC ratemaking decisions. FERC may review an APS expenditure—such as the APS investment in the Palo Verde plant—only to the extent that the expenditure affects the rates at issue in a particular rate proceeding. PTUA therefore must demonstrate that under APS' proposed rates, the APS ratepayers will pay a higher price for electricity because of Palo Verde. If PTUA does not make that showing, its specific attacks on APS' continued participation in Palo Verde are irrelevant.

■ In utility ratemaking, a utility's investments in production facilities generally are included in its rate base. The test for determining whether the utility is entitled to add a particular investment to its rate base is whether the item is "used and useful" in providing service to the current ratepayers. *Anaheim et al. v. FERC,* 669 F.2d 799, 808 (D.C.Cir.1981). In some cases, utilities have been permitted to include construction work in progress (CWIP) such as Palo Verde in their rate bases, even though the facilities under construction provide no current benefit to ratepayers. In calculating the rates under review in this proceeding, however, APS has not included the Palo Verde power plant in its rate base, either as an operating production facility or as CWIP.

■ PTUA theorizes that the cost of building the Palo Verde plant is nevertheless reflected in APS' requested rate of return, and therefore in its proposed wholesale rates. Before the ALJ, it asserted that "APS seeks to increase its rate of return so that it can attract capital to finance the construction of new plant", specifically Palo Verde. But PTUA never quantifies the alleged effect of the Palo Verde project on APS' rate of return.[5] It cites some figures from a study by Dr. Richard A. Rosen that establish APS' "return on equity" and "overall cost of capital" in the absence of Palo Verde Unit 3. PTUA fails to show why these figures are meaningful. If PTUA questions the effect of the nuclear project on the company's rate of return, the discussion should focus on the stipulated rate of return to which the parties agreed in the FERC proceedings. The stipulated rate of return was based on the recommendation of a staff witness, Hena Bagchi. Nothing in the

---

5. PTUA argues that FERC has already decided in a prior APS rate proceeding, Docket No. ER81–179, that construction of the Palo Verde plant affects APS rates. *Arizona Public Service Co.,* 21 FERC ¶ 63,007 (1982), *aff'd* 23 FERC ¶ 61,419 (1983), *appeal pending* Nos. 84–7012, 84–7119 (9th Cir. Dec. 14, 1984). PTUA's reliance on the prior FERC decision is misplaced. We must determine the impact of the Palo Verde project on the rates under review in this proceeding and we must make that determination on the basis of the evidence presented in this proceeding. Whether PTUA proved in the

other proceeding that Palo Verde affected the APS rates then under review is irrelevant.

PTUA also contends that FERC decided the issue in its favor in the current proceeding. The holding to which PTUA refers was on the issue of FERC jurisdiction to investigate the prudence of the Palo Verde project before the project enters the APS rate base. FERC held that it had jurisdiction to consider the prudence of construction expenditures "if those expenditures might affect current rates." FERC did not decide that Palo Verde expenditures had in fact affected current APS rates.

record shows how the need to finance the Palo Verde project affected the recommended rate of return.

Furthermore, the administrative law judge discredited Dr. Rosen's testimony regarding the impact of Palo Verde-related expenditures on APS rates. We find that substantial evidence supports the ALJ's conclusion. APS witness Williams testified, and the ALJ found, that Dr. Rosen's study was flawed because it did not take into account the cost of other investments to take the place of Palo Verde, and because it ignored the tax savings resulting from the construction of Palo Verde that had been passed on to APS customers. PTUA cites "supplemental testimony" by Dr. Rosen that it claims corrects the mistaken omission of the effect of the tax savings. Apparently the ALJ did not find that this testimony cured the flawed study; we have no basis for finding otherwise.

For the foregoing reasons the agency decision is AFFIRMED.